To resume, the next case is No. 2012-1428, D.A.L.P. v. SUNOVION PHARMA, Mr. Chesley. Good morning, Your Honor. May it please the Court? The question before the Court today is whether SUNOVION's clinical trial of its infringing on the public use statute adopted. Fundamentally, we are here to say that the District Court committed two basic errors, we believe. The first error was to fail to distinguish between this Court's case law with respect to commercial uses and non-commercial uses. In the commercial context, the case law makes clear that the question of protection of confidentiality is simply not involved. Indeed, in this Court's opinion in the Invidrigin case, the Court quite clearly stated the test. Ironically, the District Court quoted the Invidrigin test, but then misapplied it, because all of the cases that the District Court cited when the District Court analyzed whether there was a public use or not were commercial cases from which the Court took language, which was simply an apposite here, because in the public of the invention. And there's, indeed, a key passage at page 18 of the opinion, which is 18 in the appendix as well. The Court says, the participants had some knowledge of the compositions that they were receiving. Whatever the limits of that knowledge, though, the core issue is not public knowledge of the invention, but the public use of it, and it proposition that we're only supposed to be looking at public use and not commercialization. So, assuming you get past that hurdle, is there a reason to look at public use or the standards for public use differently when it's a third party than when it is the inventor? I don't believe so, Your Honor, for several reasons. First of all, the policy that we're articulated in the FAFT case, which is quoted in Invitrogen and quoted again by this Court in the motionless keyboard decision a few years ago, it's whether the public expectation that knowledge was going to be taken from them has been violated. And in that case, the knowledge being taken from them is independent of whether it's a third party or the inventor itself. And, indeed, Your Honor, the second reason why I say that it makes no difference Well, before we leave the knowledge question, it isn't whether the knowledge is taken from them, it's just whether the public has knowledge. It is whether the public has knowledge. I'm going to come to that in one moment, Your Honor, but I just may answer Judge O'Malley's question with one other point. There are several cases from this Court in which third parties were involved in alleged public uses. Baxter and Iolas are the two cases that come to mind. In both of those cases, the Court held that because the third party had not taken adequate steps to protect the confidentiality of the invention, the inventor lost its patent on public use grounds. And I would submit it can't be heads-I-win, tails-you-lose. It can't be that where the third party fails to take action to protect your invention, you lose. And where the third party does take action to keep its own invention as a trade secret, it can then turn around and say, although we protected it for ourselves, it's a public use with respect to your patent. Well, I think that you're still-it's still begging the question of whether when you say that the third party, when a third party took adequate steps, is the definition of adequate steps different for a third party than it would be for the inventor? And, Your Honor, I believe the answer is no. I believe the question is whether knowledge-to come to Judge Newman's question, which I think is a good segue here-the question is whether the invention was accessible to the public. And we believe that in a noncommercial context, the case law is pretty clear that that means whether the invention, the actual claims of the invention, were known to the public. And there's a very good case on that subject, actually, in the Netscape opinion, in which the inventor said, this was not a public use because one of the elements of my claim was not actually discernible from the use. This had to do with browser technology. And what this court there said was that if all the claim elements were discernible, were known to the public, you'd have a public use. In this case, there's a public use anyway because the one element that was not known to the public was covered by obviousness. And the court said because as to that one element, it would be obvious to those skilled in the art that that was the element of the invention. This court held that there was a public use. So I think whether you're dealing with a third party or not, the policy, it doesn't change. The policy, there are two policies here. One that underlies commercial use, which we're not dealing with, is whether you can exploit your monopoly for longer than the patent period by making money off of it more than a year before you file the application. That's the commercial piece, which we're not dealing with. In the noncommercial setting, the cases are clear, and the FAF case makes this clear in the Supreme Court. The policy is whether your wrenching knowledge that the public has a right to expect is theirs, away from them. And I would submit, Your Honor, it doesn't make any difference who's involved in providing that knowledge or protecting that knowledge. The question must be viewed from the perspective of the public's expectation. The public is often not aware of and in any event indifferent to whether it's the inventor or somebody else who's given them access to this knowledge. The policy is once you have access to that knowledge, can you take it away by then putting it under the umbrella of patent protection. What exactly do you mean by knowledge here? Do you mean that the public has to have the ability to understand how the invention works, or just knowledge that this invention works in the way that it was designed to work? Your Honor, I don't think it's enabled in knowledge, which I think is the first prong of your question. I don't think the public needs to be able to practice the invention or be taught how to practice the invention. I believe what the standard is, is whether the invention, defined as the claim or claims in the patent, is available to and known to the public. Okay, so the invention. I have a device which I put on a motorcycle. I put it on a lot of motorcycles. I don't sell it, but I put it on a lot of motorcycles. And it makes the I put it on all my friends' motorcycles, and anybody that comes along, I'll put it on your motorcycle. But no one in the public knows exactly how it works. Right. But they do have access to it. That would satisfy, I take it, the requirement of public use, would it not? It would depend, Your Honor, what claims of the patent that is then sought to be invalidated are. So, for example, take the motionless keyboard case. That was a case where someone invented an ergonomic keyboard which, with very minor movements of the hands, would actuate keys. The physical keyboard, a chunk of plastic with keys on it, was made available to potential investors at a point when their nondisclosure agreements had expired. So they had the keyboard. They had, arguably, whatever it is, Your Honors, put on the motorcycles. What they didn't have, and what this Court found in that case they didn't have, was the invention. Because you needed more than looking at the physical keyboard to understand how the ergonomics of the claims were actually embodied in an invention. It's not enablement. It wasn't teaching you how to use it. The question was whether the invention was in public use by virtue of a physical device from which you could not discern all of the elements of the invention. I think in that case, it wasn't that it was in use in the physical device, but the nature of the communication to a small group of investors. I think there's a significant difference between that and the hypothetical posed by Judge Bryson, which perhaps is closer to the facts of this case. Well, Your Honor, there's an unpublished opinion that we, therefore, are not relying on explicitly here, which actually involves a clinical trial, which is quite like this Janssen case, where the question was, do the people who were in the clinical trial, do they actually know what the invention is by virtue of swallowing a pill? Let me take our facts here, because I think it really answers Judge Bryson's question, or I hope it does. In our case, what the District Court said was that the people who were the subjects of the clinical trial had, quote, some knowledge about it. They knew what the drug was. They knew they were being treated for COPD. They knew that it was being nebulized. It was being given to them in a liquid form, an air form, mist form. They knew those were parts of the invention, and they knew they were taking the drug for that reason, but they didn't know the shelf-life requirements of the patent. They didn't know the pH levels of the composition, which were specified in the claims. They didn't know that the patent claims required that you not use a propellant for purposes of administering the drug. So, the judges, because the judge misapplied the standard by looking at the commercial cases, he said, well, they had knowledge of it, and it's knowing what the claims really are doesn't matter here. It's just that the invention is out in the public use, and respectfully, it does matter. It does matter because the invention is not in public use if, in fact, the public is not aware of, does not have knowledge of the invention, such that the policy that underlies those cases will be offended by wrenching that knowledge away from the public. So, you're saying in a pharmaceutical case, you can always put the drug out there as long as people don't understand what the chemical makeup is? No, Your Honor, because there are doctors involved in clinical trials, and in this case, the doctors knew what the invention was, but they were under nondisclosure agreements. So, I would turn the question around the other way, Your Honor. If, in fact, it's just enough to take the pill without knowing what the invention is, then in virtually every self-administered clinical trial, of which this was one, and there are scores of them that happen every year, you'd have a public use problem if somebody files a patent one year and one day after the clinical trial, for which there may be very good reasons in many cases. This was a standard clinical trial in which the patients were subjected to the standard protocols, they were told they had to return the drug, they were monitored very closely by Sinovian, and the doctors who actually knew the other elements of the invention were covered by nondisclosure agreements. So, the answer to your question, Your Honor, respectfully, is no. It's not for every case. And the district court made another critical error in that context. The district court focused at some length on the fact that a small number of vials of the drug, out of thousands that were administered, were lost in every turn. And the district court pointed to that as evidence that, in fact, the invention was in the public domain. This was a summary judgment motion in which all inferences are to be construed in favor of the non-moving party. There's no evidence that those vials ended up in the hands of a biochemist. For all we know, those vials fell on the floor, were broken, were swept up and thrown away in the garbage. That's a good segue, as you would say. So, let's move to that. And may I say, Your Honor, I've reserved three minutes for rebuttal. I just... Can I just ask a question? You go back and forth in your papers as to what exactly it is that you're asking us to do, but your reference right there to summary judgment, are you saying that this is a jury question as to public accessibility, or is it a determination that we have to make as a matter of law? I believe the court correctly said, the district court correctly got half of it right, that the question of public use is a question of law, but this court's case is, say, informed by the underlying facts. Okay, what are the underlying facts here that you think a jury has to determine? That there were other elements of the invention, such as pH, non-propellant, etc. that I mentioned before. Were those known to the public or not during the alleged public use, for example? And what happened to those vials of several vials of drug that were lost? As I said, if they fell into the hands of a biochemist, we might have a public use problem. If they fell on the floor and broke and were swept away and thrown in the garbage, we don't. The record doesn't know what happened to them. Those are examples of the kinds of factual questions that would have to be determined before a court could decide, as a matter of law, there's been a public use informed by the facts. Respectfully, this district court got some of the facts wrong, and it was therefore inappropriate to enter summary judgment, and this court ought to vacate that judgment. You, I take it, did not file a separate motion for summary judgment, is that correct? I was not counsel below, but I believe that's correct. I looked at the docket sheet, but it's so cluttered with claims of confidentiality that I really couldn't tell. Your Honor, I will check with my colleagues. I don't want to give the court misinformation. I don't believe you, but I will check. Okay. Thank you, Mr. Chesler. We'll take every bit of time. Thank you very much, Your Honor. Mr. O'Malley. Good morning, Your Honor, and please support. Now, they argue that there's a distinction in the law, that if it's a non-commercial public use, it has to disclose the claim features of the invention, whereas if it's a commercial public use, and I don't know how they distinguish that from on sale, but in any event, they say if it's a commercial public use, then there doesn't have to be a disclosure of the claim features of the invention. Now, I'm going to argue in a moment that that is not the law of this court or the law of the Supreme Court, but if it were, it would lead to an absurd result that would allow patentees to game the system, and I'd argue it would really eviscerate the public use defense. Now, let's take the example that Mr. Chesler cited. In these claims, in the claims listed at page 8 of today's opening brief, if you look at the shelf life limitation, it states that the formulation has an estimated shelf life of greater than about 94% after three months, storage at 25 degrees C, that's room temperature, and greater than about three months storage at 5 degrees C. Now, there's, first of all, no dispute that at the time we did our studies, we had the stability data that indicated that we had that very modest stability, and when I say formulation. But under this law that they propose, for some reason, we would have had to anticipate years before they filed further patent applications that one day they would put this inherent property in their claim limitation, and then we'd have to go to our patients and say, listen, I'm going to tell you what the stability of this formulation is at 25 degrees C and at 5 degrees C. Now, even if we had done that, this second family of five patents trickled out during the course of this long lawsuit. The last issue came about two years after the lawsuit started. Well, that's kind of a strange argument. That's assuming that what you wanted to do was put it out into the public, but presumably you were doing a clinical trial hoping that you would be able to patent this or you would be able to maintain it as a trade secret, correct? Well, no. In fact, we did patent it. We patented our composition before we ever started our clinical trial. Right, but you've waived any claim. You've waived an anticipation claim. You've waived any ability to square behind this, correct? Yes. Please understand that my point is not that our patent is somehow prior art. My point is that if they want to evade a public use defense by virtue of their own twist on the rule of law, all they have to do is build into their claims more and more inherent properties that are neither visible nor easily ascertainable or reverse engineered. So even if we had put that stability in our protocol that we gave to patients for some strange reason, when they're prosecuting these patents years later, they could put in the particle size of the four motor ball before it's put in the solution, and they'd say, Let me interrupt you for your comment on diversion. You say your patent is not prior art. The patent office thought it was prior art, didn't they? No, what I said, Judge Newman, to be precise, I'm not arguing it here as a prior art that somehow invalidates. In Day's reply brief, they said we were somehow bringing in a new prior art defense. That's not the case. What Day argued in the brief is that we had maintained our formulation as trade secret. Yes, it's not the argument here. I agree, and I must say I thought that that was curious. Was that argument before the trial court? Which argument, Judge? That there was, in fact, prior art to the second family? It has nothing to do with the summary judgment proceedings. We raised the Dow patent to rebut this notion that we were maintaining our formulation as trade secret. It doesn't make sense because years before Study 50 starts, we filed a Dow patent, and it's in the appendix at A3296. What it says is that our product is an aqueous aerosol formulation for use in a nebulizer, may be prepared by dissolving two milligrams of promoterol tartrate in ten milliliters of citric-buffered saline, buffered to pH 5. But this is a bit of a circle. If, in fact, that prior art patent was exactly the same formulation or read on the claims, I presume you would not have dismissed with prejudice all of your arguments under 102G and 102E, right? There's two separate inquiries, and they try to blur the distinction. We're not using our patent as invalidating prior art because they have this stability limitation that we don't expressly disclose in our patent. We're using our patent for entirely different uses to show there's no way we were maintaining our formulation as a trade secret because we filed and disclosed it in a patent before we ever did our study. And that rebuts this notion that it's a trade secret. But for purposes of the record before us, we are supposed to assume that your study actually did practice the exact same formulation as your opponent's patent. That's correct. So, your patent didn't practice that formulation, correct? No. All right. So, that's critical, is it not? It's not critical. Our own patent discloses the formulation. Now, we don't have every element of what they later build into their claims knowing our patent. So, they, for example, have this shelf-life stability limitation, which is not expressly in our patent. However, it's the same formulation. It has that formulation. You're saying that the original, the formulation in the Gallup patent did not have this shelf-life stability? It doesn't disclose it. That wasn't my question. It's the exact same formulation but for a different concentration. You're not arguing adherency or obviousness? Not for the purpose of this summary judgment motion because that might have introduced  Well, not for any purpose, right? You've dismissed with prejudice the rest of those offenses, correct? We rely on Gallup for one purpose and one purpose only to rebut that this was a secret use because patenting our formulation, this is listed in the orange book as covering our formulation, is antithetical to the notion that we protected it as a trade secret. Now, I'd like to get back to this test of whether there's really a distinction that a non-commercial public use has to disclose the claimed features. I argue that it would lead to a way of patentees gaining the system but, in fact, not only is it that it shouldn't be the law, it's not the law. And you go all the way back to the Supreme Court cases and you see that beginning with City of Elizabeth. City of Elizabeth was a three-layer paving system that the inventor laid down on a toll road. That's an experimental use case, right? Well, yes. But before you get to experimental use, experimental use negates a public use. You first find, and the Supreme Court did in fact find, that quote that the use of the pavement in question is public in one sense cannot be disputed. It was laid down on a toll road. Now, the inventor received no money from that. But there was no way for anyone driving on that toll road to see anything but the top of the top of this three-layer system. It didn't disclose the claimed features. And, yes, eventually the experimental use was held to negate the public nature of that use. Now, let's go to the next Supreme Court case that's in Ray Egbert. Now, they in the brief says that's a quaint little case but it's Supreme Court precedent. And it's cited and often discussed in almost every public use decision of that court. Now, in that decision, in contrast to how they characterized it, it wasn't the mere disclosure of these corset steels by the inventor to his lady friend. It was the three years subsequent to that where she wears them in her corsets, walking around in public, obviously under other clothing. And in that case, the Supreme Court dealt with this notion that that public use of her wearing these corsets was not visible to the public. And I think just three sentences from that decision are instructive. They said, quote, we say thirdly that some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye. An invention may consist of a lever or spring hitting in the running gear of a watch or even a device on a motorcycle for that matter. That's obviously not in the 1800 quote. Or in a ratchet, shaft, or cog wheel covered from view in the recess of a machine for spinning or weaving. Nevertheless, if its inventor sells a machine of which his invention forms a part and allows it to be used without restriction of any kind, the use is a public one. Now, they says, well, all the decisions that the district court relied on were commercial cases. Well, New Railhead is not. There are two parts of New Railhead. One was an on-sale bar. But the other was a public use that's based on a completely separate set of facts. It's a horizontal drilling bit. It's undisputed that the public can't see it in action. It's under the ground. And nevertheless, this court held that that was an invalidating public use, dealing expressly for this notion that it didn't have to be visible. The inventor received no compensation for his use. It was a commercial drilling site. But he had just lent these drill bits to an acquaintance of his. He received no commercial remuneration for the use of these. Similarly in Baxter Labs, if you look at the claim limitations there, clearly they deal with the internal structure of elements of the sealless centrifuge, which was used without restriction to the inventor in this lab. And it's even a more compelling case in our case. These patients aren't using their medicines in a private laboratory. They're using them in their homes, where anyone could come off the street, where they could show them, discuss them with anyone. And it's even more public, I would submit, than the use that was in the lab. One could argue that in the privacy of one's home is actually more private and more restrictive than in an open hospital, where all kinds of medical personnel would have access to it. Well, I would argue that the way you distinguish that is that they are the public. Those people in their homes are the public, with respect to the day it happens. So the moment they take it out of the clinics, it is in the public. No matter whether it's in their homes, whether it's in Starbucks with them. Well, that would then apply to every clinical trial, would it not? Well, this really, I think, comes back to the question you asked Mr. Kessler. Does it matter whether confidentiality, does it matter whether the use is a third party, does it matter whether confidentiality really goes to the third party? And I believe it does, because the test for public use, and this is in all of the decision cited by either party, is, quote, public use includes any use of the claimed invention by a person other than the inventor, who is under no limitation, restriction, or obligation of secrecy to the inventor. So the context of every one of those cases that uses that language is where the use that was challenged was an inventor use, correct? Well, you find that language in these third party cases. ELS, each homes as well. It's sort of the standard way that all these cases begin, but it's clear... But in ELS, what they were looking at is whether there was confidentiality owed to the third party. Is that specifically what they said? In ELS, and in the Beachcomber case, and the other case that Mr. Kessler mentioned, they find it invalidating public use. And they do note, in fact, that in most of those cases there's no confidentiality that runs to the third party. Now, what Dave tries to do is flip that and make it stand for the converse proposition, namely that therefore, if there is confidentiality running to the third party, there cannot be a public use. But logic doesn't work that way. The converse doesn't prove the converse proposition. So those cases are of limited use. They invalidated the patents. A more, I think, on point case is the Netscape case. In that case, everyone in the facility was under duty of confidentiality to the Department of Energy. All the research work they were doing was confidential. But one of the employees, who was the inventor of the system, showed his database search system to two other employees. But they don't meet this standard of being under obligation of confidentiality to the inventor. And really, when you think about that standard, it's just another way of defining who the public is. With respect to Dave's patent, you always have to ask yourself, whose patent are you talking about before you define who the public is? With respect to Dave's patent, the public was anyone other than Dave or anyone other than someone under confidentiality obligation to Dave. So with respect to your patent, and certainly the cases that we see, the pharmaceutical company or whoever's conducting the clinical trials always has their patent application on file before the beginning of their clinical trials. And so reading this in the most straightforward manner, it seemed to me that that's where the GAL patent came into it. That was deemed to protect the patentee. That's correct. That was conducting the clinical trials. That's correct, Jeff Newman. Either you get your patent on before you conduct your clinical trials or in those cases where you need the clinical trial to show that your invention works for its intended purpose. For example, if you have method of treatment claims where you have to show that the drug actually performs safely and with efficacy, sometimes the only way you can show it works for its intended purpose is through that clinical trial. So what you do then is you put your investigators under confidentiality. That confidentiality does flow to the inventor. And then you otherwise protect the confidentiality of trials. In the Eli Lilly case, they closely monitored the folks who were taking the medicine and kept them in an Eli controlled facility. That's how you take that second instance where you can't file your patent ahead of time. But if your patent is ready for patenting, if your invention is ready for patenting, you should get your patent on file. And that's why the pharmaceutical industry wasn't disturbed about this decision. They invited them to file amicus briefs. No one did. So I would ask that this court affirm. Thank you. Okay. Any more questions for Mr. O'Malley? Thank you, Mr. O'Malley. Okay. Mr. Chesley. Thank you, Your Honor. Just several points. First, with respect to counsel's point that this would allow for gaming of the system, I find that hard to understand. By definition, if this patent wasn't filed and where there's a public use problem, it would always be a patent not yet filed. The idea that somehow they would be engaged, the people doing the clinical trial would be engaged in an exercise of trying to invalidate a future patent as opposed to get a drug that will help people on the market makes no sense to me, frankly. I don't understand that. And with respect to this particular case, the vice president of chemical research and development in the pharmaceutical division of Synovium testified that the formulation of the batches that were in the clinical trials was, quote, confidential and, quote, not available to the public, unquote. That's from 11333 and 11338 of the appendix. So contrary to what counsel said, the Gallup patent did not give them protection for their clinical trial. It protected some, but not all, of the elements of the compound that was being tested, and their own head of research admitted that it was confidential. So what we have here, to go back to the third party point, Your Honor, is for me, Synovium, it's confidential, according to their own head of research. But for you, they, it's a public use for your patent. And I would submit that that's precisely gaming the system, contrary to what we're accused of doing, and that that's precisely what the public use doctrine should not be permitted to be used for. Second, the City of Elizabeth case was a commercial use case in which it was unnecessary, once you have commercial use, to parse out, excuse me, it was an experimental use case, I misspoke, in which case it's unnecessary to parse out whether it's commercial or non-commercial. If it's, in fact, experimental, then it is not a public use, even if it would otherwise have been a public use. The Egbert case, the Corset case, was a situation in which the woman who was given the corset by the inventor was, in fact, a member of the public. And although it's an old case, and the reasoning is not as well articulated as many of your much more recent cases, it's quite consistent with the case law. A member of the public had the invention. It was accessible in the most intimate way to the public in that case, and therefore there was a public use. With respect to the question of... Are you saying that if the device had been one which was more complex and perhaps involved smaller parts than the corset wires, presumably something very simple and easy to discern what it was just from looking at it, but if it had been complex and not something that the woman who was wearing it could figure out what it was from just looking at it, then that wouldn't have been a public use case? I say again, Your Honor, it depends what the patent is that is subsequently sought to be invalidated. If you showed me the claim, I could answer that question in a very direct way. Because I believe the cases make clear that the question is whether the invention is in public use, and the only cases that talk about the mere device being out there is enough are the commercial use cases. Okay. The patent says... It describes the device and it says, and it will have a five-year lifetime. And after three years, she throws the thing away because she doesn't know whether it has a five-year lifetime or not. Is that not a public use under those circumstances? Under those circumstances, I would say it's not, Your Honor. It's not a public use. Because the knowledge of the invention has not been taken from the public. And there are all sorts of cases, Your Honor, all sorts of cases where there... And motionless keyboard is one of them, but there are many others that this Court has decided. When something is out in the public, the question is what is accessible to the public. Is it the mere presence of something that embodies the invention, or is it more than that? And what I would submit to Your Honor is when you look at the cases, as we have carefully, and I'm sure this Court will, the cases that have the language, which is... cited by the district court in the course of its opinion, that say it's not what you do. It's whether the invention was being used, or the commercial use cases, where that's precisely right. That's the law. The Court simply missed this distinction. And it's a distinction which this Court made absolutely explicit in the administration case. It doesn't say accessible to the public and. It says accessible to the public or commercial use. And elsewhere in that opinion, it makes it absolutely clear that where it is a public use, the question of secrecy doesn't matter at all. That's also what this Court said 20 years before the TT Labs case. If it's a commercial use, we're not concerned with secrecy. Here, where there's no dispute, it's not commercial. You have to do a clinical trial to get to the commercial use stage. The question before this Court is what is accessible to the public mean. That's exactly, Your Honor, what your question goes to. That's the problem. And we believe the problem is solved by cases like Netscape and others that we have studied. Thank you, Mr. Chancellor. Thank you, Your Honor. Thank you, Mr. O'Malley. The case is taken under submission. That concludes the argument cases for this panel this morning. All rise.